IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 17-cv-1525-MSK

MARK WILSON, and
WILSON LAW LTD.,

    Plaintiffs,

*v*.

ADVISORLAW LLC,
DOCHTOR DANIEL KENNEDY, and
STACY SANTMYER,

    Defendants.

---

**OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT,
MOTION TO DISMISS, AND MOTION FOR SANCTIONS**

---

    **THIS MATTER** comes before the Court on the Plaintiffs' Motion for Sanctions (# **58**), the Defendants' response (# **59**), and the Plaintiffs' reply (# **67**); the Defendants' Motion to Dismiss (# **61**), the Plaintiffs' response (# **69**), and the Defendants' reply (# **72**); the Plaintiffs' Motion for Summary Judgment (# **62**), the Defendants' response (# **70**), and the Plaintiffs' reply (# **74**); the Defendants' Motion for Summary Judgment (# **63**), the Plaintiffs' response (# **71**), and the Defendants' reply (# **73**). For the reasons that follow, the Defendants' Motion for Summary Judgment is granted on one claim and the rest are dismissed.

### I.  JURISDICTION

    The Court has jurisdiction to hear this case under 28 U.S.C. § 1331.

## II. FACTUAL BACKGROUND

This action arises out of a business dispute. The undisputed facts[1] can be summarized briefly and are supplemented as necessary in the Court's analysis. According to the Amended Complaint, Plaintiff Mark Wilson and Defendant Dochtor Kennedy did business through corporate entities, Wilson Law Ltd. and AdvisorLaw LLC, respectively, which entities did business with each other. AdvisorLaw elected to terminate this business relationship in October 2016.

Apparently, the separation was not amicable. In an email on November 2, 2016, Mr. Kennedy accused Mr. Wilson of "competing with my business." # 11 at 6. In another email, Mr. Kennedy asserted that Mr. Wilson was using AdvisorLaw without authorization and to its detriment. That same day, a "Patrick Erickson" posted a negative review of Wilson Law on the website ripoffreport.com (Review):

> Mark H. Wilson sounds very trustworthy and experienced. **He lied to me with no reservations**. He made claims of his experience, affiliations, credentials, and acumen [sic] which were complete fabrications. **He conned me** into hiring his **sham of a company** (operating out of his home in Denver, CO) to save my career.
>
> I desperately needed an experienced lawyer to navigate FINRA and the IRS issues which resulted from a recent divorce. Mark portrayed himself as an expert with vast experience. Only after paying him **upwards of $15,000** did I begin to have concern over the lack of progress. After paying additional money to a professional investigator, I learned that Mark had **flat out lied to me** about all of it.
>
> When I confronted Mark, he refused to admit that he had taken advantage of me. Even when hard evidence of his lies sent by email and recorded conversations proven to be lies were provided, he told me candidly "good luck getting any money back." **He said**, "I am very good at **hiding from judgments and collections**." That may have been the ONLY true thing he said.

Ex. 3 to Am. Compl., # 11-3 at 2 (emphases in original).

---

[1] The Court recounts the undisputed facts and notes disputed facts where appropriate. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

Forensic evidence indicates that the Review was posted at 8:23 PM from Mr. Kennedy's home. Mr. Kennedy was at his home that night, but Jason Bacher was also there for a period of time. The evidence of record does not conclusively indicate when Mr. Bacher left the house. The parties thus advance competing theories as to how the Review was posted: the Plaintiffs say Mr. Kennedy posted the Review, and the Defendants maintain that Mr. Bacher posted it.

In the Amended Complaint (**# 11**), the Plaintiff asserts the following claims: (1) false advertising under the Lanham Act, (2) deceptive trade practices under the Colorado Consumer Protection Act (CCPA), (4) defamation, and (5) civil conspiracy. In their Answer (**# 17**), the Defendants assert four counterclaims: (1) civil conspiracy, (2) three claims under the Colorado Organized Crime Control Act, and (3) aiding and abetting a breach of fiduciary duty. Both parties have moved for summary judgment (**## 62, 63**), the Defendants on three of the Plaintiffs' claims and the Plaintiffs on an element of its defamation claim.

## III. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for

either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus. Inc. v. Arvin Indus. Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

This case involves cross-motions for summary judgment. "Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a *prima facie* case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently." *In re Ribozyme Pharmaceuticals, Inc., Securities Litig.*, 209 F. Supp.

2d 1106, 1112 (D. Colo. 2002); *see also Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

## IV. DISCUSSION

The Defendants move for summary judgment on most of the Plaintiffs' false-advertising claim under the Lanham Act, CCPA claim, and civil conspiracy claims. They do not seek judgment on the Plaintiffs' defamation claim; instead they ask the Court to decline supplemental jurisdiction following a favorable ruling on the false-advertising claim, the lynchpin for federal-question jurisdiction. Because the Court grants summary judgment on the federal claim, it declines to exercise supplemental jurisdiction over the remaining claims.

### A. False Advertising Under the Lanham Act

The Lanham Act prohibits a person from using, in commercial advertising or promotion, any "false or misleading description of fact" that "misrepresents the nature, characteristics, qualities, or geographic origin" of another person's services or commercial activities. 15 U.S.C. § 1125(a). To establish a claim for false advertising, the Plaintiffs must show that: (1) the Defendants made a materially false or misleading representation of fact (2) in connection with their commercial advertising or promotion (3) in commerce; (4) such representation misrepresents the nature of the Plaintiffs' services or commercial activities; and (5) the Plaintiffs have been or are likely to be injured as a result. *See World Wide Ass'n of Specialty Programs v.*

*Pure Inc.*, 450 F.3d 1132, 1140 (10th Cir. 2006); J. Thomas McCarthy, *McCarthy on Trademarks* § 27:24 (5th ed. 2017).[2]

The Defendants argue that the Plaintiffs cannot demonstrate triable fact issue on Elements 2 and 5. They contend the Review is not commercial advertising or promotion as a matter of law. In addition, if it were, the Plaintiffs cannot prove any injury that resulted from it.

To constitute "commercial advertising or promotion", a factual representation must have four characteristics: (1) it must be commercial speech, (2) it must be made by (or on behalf of) a defendant who is in commercial competition with the plaintiff, (3) it must be for the purpose of influencing consumers to obtain the defendant's services, and (4) it must be disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within the relevant industry. *See Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273–74 (10th Cir. 2000). The Defendants argue that the Plaintiffs have no evidence that would establish that the Review was sufficiently disseminated to the relevant purchasing public such that the industry would consider it advertising.

This Court has already found Tenth Circuit precedent instructive on this issue. *Gen. Steel Domestic Sales LLC v. Chumley*, 129 F. Supp. 3d 1158, 1175 (D. Colo. 2015) (citing *Sports Unlimited Inc. v. Lankford Enters. Inc.*, 275 F.3d 996, 1003–04 (10th Cir. 2002)). *Sports*

---

[2] In *Pure*, the Tenth Circuit's conception of the elements of a false-advertising claim includes the likelihood of confusion or mistake over product characteristics, which is clearly derived from § 1125(a)(1)(A). Subsection (A) pertains to trademark infringement claims. Tracing Tenth Circuit precedent, *Pure's* conception of the false-advertising elements originated from a treatise. *See Cottrell Ltd. v. Biotrol Int'l Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999) (citing Charles E. McKenney & George F. Long III, *Federal Unfair Competition: Lanham Act § 43(a)* § 6 (11th ed. 1998)). Section 6 of this treatise does not cover subsection (A); indeed, the entire section covers subsection (B). Its conception of the false-advertising elements makes no reference to the likelihood of confusion. McKenney & Long, *supra*, § 6.3. For these reasons, the Court has modified the false-advertising elements to remove any reference to likelihood of confusion in accordance with McCarthy's treatise.

*Unlimited* makes clear that to constitute an actionable advertising or promotional campaign, the dissemination of information must reach some significant number of actual or potential customers of the parties' products. In *General Steel*, the Court found the record vague as to how many human beings might have encountered the published material.

The Plaintiffs direct the Court several items of evidence to establish how many potential consumers encountered the Review. The Court addresses each in turn.

First, the Plaintiffs point out that, according to Colorado court records, in the year following the Review's publication, AdvisorLaw represented at least 111 clients. The Plaintiffs do not indicate how many cases they themselves handled in the same period of time, but the implication of their argument is that that number is low. The Plaintiffs suggest that because "so many clients hired the Defendants instead of the Plaintiffs to represent them in FINRA-related state court proceedings a few months after the [Review's] publication," an issue of fact arises as to the breadth of the Review's dissemination. Putting aside the absence of any comparable case statistics on the Plaintiffs' side of the proposed comparison, the mere fact that the Defendants found success while the Plaintiffs did not does not, standing alone, permit any inference that the Review was the causal factor. Any number of unaccounted-for externalities could explain such a disparity: the Defendants advertised their services more aggressively than the Plaintiffs; the Defendants secured an influential client who actively recommended the Defendants' services to others whereas the Plaintiffs did not; perhaps the Defendants simply provide better services. Without controlling for a universe of contributing factors – and the Plaintiffs do not -- simply comparing case statistics between the two parties does not provide a logical basis from which to infer the breadth of the Review's dissemination.

Next, the Plaintiffs offer several arguments that all relate to characteristics of the ripoffreport.com website: that it notoriously refuses to remove reviews, that it promotes its reach to "millions of customers," and that reviews posted there are quickly absorbed by search engines. (The Plaintiffs also speculate, without pointing to supporting evidence, that the Review may have been prominently displayed to all ripoffreport.com visitors for a period of time after Nov. 2, 2016.) But the mere fact that ripoffreport.com is a heavily-trafficked site does not mean that the Review itself was broadly seen by the Plaintiffs' potential customers. Just as opening a storefront on a busy street does not guarantee a steady flow of actual customer traffic, the fact that ripoffreport.com may attract millions of visitors does not guarantee that any of those millions of viewers went looking for reviews of the Plaintiffs' services in particular, much less that such visitors saw the Review in question. And even if they did, the Plaintiffs offer no evidence to show that the visitors reading the review were otherwise potential customers of the Plaintiffs' services, rather than, for example, disinterested internet scamps vicariously enjoying particularly scathing poison-pill notes. Thus, the mere fact of ripoffreport.com's popularity and characteristics does not substitute for proof by the Plaintiffs of actual dissemination of the Review to the Plaintiffs' potential customer base.

The Plaintiffs also offer Mr. Wilson's own observation that "I was having a hard time getting new clients" after November 2016, and yet "I had zero problems getting new clients" before then. But again, the Plaintiffs' difficulties in obtaining new clients could be attributable to any number of innocent factors unrelated to the Review itself, and Mr. Wilson's own vague suspicions do little to isolate those factors from his conclusion that the Review is the true culprit. Moreover, Mr. Wilson's testimony is simply conclusory – the Plaintiffs do not offer the particular client data that underlies Mr. Wilson's opinion, leading to the possibility that although

it may have seemed to Mr. Wilson that clients were slower in coming after November 2016, that feeling may not have been what was actually happening. Thus, the mere articulation of Mr. Wilson's own conclusory assertion that the Review was the cause of the Plaintiffs' client-acquisition woes is not sufficient to demonstrate a triable issue of fact regarding the dissemination of the Review.

Finally, the Plaintiffs point to evidence from their expert that establishes that internet searches using some 12 different search terms (*e.g.* "wilson law, ltd."; "mark h. wilson attorney"; "mark wilson finra") routinely yield a link to the Review within the first page of search results. But again, the mere fact that the Review can be seen is not proof that it was seen, particularly by the Plaintiffs' potential clients. There is no evidence, in the expert's report or the remainder of the Plaintiffs' summary judgment response, that indicates how potential customers of the Plaintiffs' services typically collect information and make purchasing decisions. It may be that such customers simply perform cursory internet searches. But it may also be that clients seeking the specialized legal services that the Plaintiffs provide are more likely to obtain information through recommendations and referrals from other legal professionals, through bar association directories or membership societies, or through targeted advertising in trade publications. It may be that the Plaintiffs' potential client base consists of unsophisticated and credulous individuals who might be influenced by an anonymous internet review, or it might be that the client base consists of sophisticated businesspeople and investors who would likely ignore such scurrilous material, were they to even encounter it in the first place.

This gap between what is possible and what is probable (in this context, in the sense of "sufficient to support a factfinder's verdict in favor of the Plaintiffs) is highlighted by the Plaintiffs' own expert report. The expert was specifically asked to determine key facts, such as

9

"how many people probably read [the Review]?" and "approximately how many prospective customers did the publication of [the Review] discourage from doing business with the plaintiffs?" The expert's answers to these questions devolve back to the same generalized and speculative evidence discussed above. For example, in response to the question "how many people probably read [the Review]," the expert states simply that "ripoffreport.com is one of the more popular websites in the U.S.," and that it "receive[s] up to 250,000 visitors per day." In response to the question "how many prospective customers . . . [were] discourage[d] from doing business with the Plaintiffs," the expert candidly concedes "This is impossible to determine quantitatively." Although the Court agrees with the Plaintiffs' expert that quantifying the scope and effect of the Review's publication is a difficult task, it is not necessarily an impossible one. It might be possible to obtain analytic web data showing exactly how many times the Review was accessed, whether directly from ripoffreport.com or through links from major search engines. The Plaintiffs might be able to speak with client leads who ultimately decided to obtain other legal representation to determine whether the potential clients saw the Review and based their business decisions upon it. Difficult as these tasks may be, they are necessary to developing the kind of evidence necessary to avoid summary judgment in a case like this.

In short, then, the Plaintiffs have only come forward with a <u>theory</u> that the Review was broadly disseminated to the Plaintiffs prospective customers and that it had a tendency to discourage those customers from retaining the Plaintiffs, but they have not come forward with any particular <u>proof</u> that this is indeed what occurred. As a result, the Defendants are entitled to summary judgment on the Plaintiffs' Lanham Act claims.

    **B. Remaining State-Law Claims**

Violations of the CCPA, civil conspiracy, and defamation are all state-law causes of action, as are the asserted counterclaims. Having dismissed the sole federal claim over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over the remaining claims and counterclaims pursuant to 28 U.S.C. §1367(c)(3).

### C. Motion for Sanctions

The Plaintiffs ask the Court to sanction the Defendants for lying in their discovery responses. Summarizing somewhat the Plaintiffs' evidence, they point out: (1) the fact that the Review was published from a computer within Mr. Kennedy's house at 8:23 PM on November 2, 2016; (2) Mr. Kennedy denies that his wife, who was present in the home at that time, would have posted the Review; (3) Mr. Kennedy's deposition testimony established that Jason Bacher – the person whom the Defendants finger for publishing the Review – was not at Mr. Kennedy's house between 8:09 PM and 9:05 PM on that date; and (4) there was a roughly 40 minute period between 8:13 PM and 8:54 PM on that date when Mr. Kennedy was not sending any text messages (to Mr. Bacher or others). Based on these facts, the Plaintiffs conclude that "the evidence . . . irrefutably proves Mr. Kennedy is the only person who could have published" the Review.

The Plaintiffs then observe that, in responding to various interrogatories, Mr. Kennedy Mr. Kennedy refused to acknowledge that he was the author of the Review. Most pertinently, they point to Interrogatory #4, which inquired about details about "each Ripoff Report account you used to publish statements," to which Mr. Kennedy answered "none." Citing to Fed. R. Civ. P. 26(g)(3) – authorizing sanctions against persons who, "without substantial justification," sign interrogatory responses that are not "complete and correct" – and Fed. R. Civ. P. 37(c)(1) – providing for sanctions where a party fails to properly supplement interrogatory responses – the

11

Plaintiffs request that the Court: (1) "find that Mr. Kennedy . . . published [the Review]"; (2) "find that Jason Bacher did not publish [the Review]"; (3) "Order AdvisorLaw LLC to send [to ripoffreport.com] a copy of the Court's forthcoming order that asks [ripoffreport.com] to permanently delete [the Review]"; (4) "Order Mr. Kennedy to submit a copy of this Court's forthcoming order to the Colorado Office of the Attorney Regulation Counsel"; and (5) require the Defendants to pay the Plaintiffs attorney fees for discovery matters arising after the date of Mr. Kennedy's deposition.

Putting aside the absurdity of some of the items of relief requested by the Plaintiffs, the Court is not prepared to concede that the conclusion – "Mr. Kennedy is the only person who could have published the Review" – necessarily flows from the evidence adduced. The Plaintiffs have outlined a cogent, and perhaps even somewhat persuasive, explanation for a conclusion that Mr. Kennedy is indeed the author of the Review. But that conclusion is hardly "irrefutabl[e]" on the evidence provided. It is apparently undisputed that at least one other person – namely, Mr. Kennedy's wife -- was in the home at the pertinent time. The Plaintiffs seem to be willing to credit Mr. Kennedy's testimony when it serves their objective, such as when Mr. Kennedy insists that his wife did not write the Review, yet they insist that Mr. Kennedy's denials of his own involvement must be adjudged to be incredible. Perhaps they are, and perhaps they are not – perhaps Mr. Kennedy's knowledge of his wife's actions is incomplete or mistaken. This Court is reluctant to attempt to usurp the factfinder's role in evaluating Mr. Kennedy's credibility in such circumstances.

Moreover, even assuming that the Plaintiffs are correct and that Mr. Bacher was not at Mr. Kennedy's home at the pertinent time, the Court cannot say that, on the instant record, Mr. Kennedy's interrogatory responses are necessarily intentionally false, such that sanctions would

be appropriate. Again, it is important to note that the alleged sanctionable act is Mr. Kennedy answering an interrogatory asking about "each Ripoff Report account you used to publish statements" with the answer "none." The absence of Mr. Bacher in Mr. Kennedy's home at the pertinent time does not <u>directly</u> render Mr. Kennedy's interrogatory response to be any less truthful. Consider the chain of logic articulated by the Plaintiffs: if (a) the Review was published from Mr. Kennedy's house at 8:23 PM; and if (b) Mr. Bacher was not at Mr. Kennedy's house at that time; and if (c) Mr. Kennedy's wife, the only other person in the house at the time, did not publish the review; then (d) Mr. Kennedy must have published the Review. But to justify sanctions based on false interrogatory responses – *i.e.* a response that Mr. Kennedy did not use a Ripoff Report <u>account</u> to publish a statement -- that chain of logic must be extended by several additional links for which no supporting evidence has been demonstrated: (e) that it is impossible for a review to be published on Ripoff Report without the publisher having an account; (f) that the person who created the account is the same person who published the Review; and (g) that to the extent Mr. Kennedy was the person who caused the Review to be published, that he was aware that he was using a Ripoff Report account to do so, among others. The Court will not speculate as to the probability that each of these additional facts occurred; it is sufficient to note that, to the extent the Plaintiffs request that the Court usurp the factfinder's ability to evaluate one of the central factual disputes in this case, the Court will not do so without conclusive evidence establishing each and every fact necessary to reach the desired conclusion. Because the Plaintiffs have not come forward with such evidence, the motion for sanctions is denied.

## V. CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (**# 63**) is **GRANTED IN PART**. The Defendants are entitled to summary judgment in their favor on the

Plaintiffs' Lanham Act claim, and the Clerk of the Court shall enter such judgment. There being no remaining subject-matter jurisdiction over the Plaintiffs' remaining claims, those claims are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3). The Defendants' Motion to Dismiss (**# 61**) and the Plaintiffs' Motion for Summary Judgment (**# 62**) are **DENIED AS MOOT**. The Plaintiffs' Motion for Sanctions (**# 58**) is **DENIED**.

Dated this 10th day of October, 2018.

**BY THE COURT:**

*[signature: Marcia S. Krieger]*

Marcia S. Krieger
Chief United States District Judge